WALGREEN CO., et al., Plaintiffs,

v.

John V. RULLAN, Secretary of the Puerto Rico Department of Health, Defendant.

No. CIV. 00–1227(HL).

United States District Court, D. Puerto Rico.

Sept. 8, 2003.

Francisco A. Besosa, Adsuar, Muniz, Goyco & Besosa, San Juan, PR, Stephen D. Poss, Boston, MA, Yolanda Benitez–Sanchez, San Juan, PR, Henry C. Dinger, Goodwin Procter LLP, Boston, MA, for Walgreen Co., Walgreens of San Patricio, Inc., Walgreens of Puerto Rico, Inc., plaintiffs.

Salvador J. Antonetti–Stutts, Pietrantoni Mendez & Alvarez, Carlos Del–Valle–Craz, Department of Justice, Federal Litigation Division, San Juan, PR, for Carmen

Feliciano–de–Melecio, John Rullan, defendants.

## OPINION AND ORDER

LAFFITTE, Chief Judge.

Before the Court are both Plaintiffs' and Defendant's Motions for Summary Judgment (See Dkts. 115 and 122, respectively), and their Oppositions (See Dkts. 127 and 126, respectively). Plaintiffs are Walgreen Company and two wholly owned subsidiaries operating in Puerto Rico (collectively "Walgreens"). Plaintiffs bring this action pursuant to 42 U.S.C.A § 1983[1] against John V. Rullan, Puerto Rico's Secretary of Health (the "Secretary").[2] Walgreens challenges the regime which is applied in Puerto Rico to the opening and relocation of pharmacies. The specific provisions are sections 334 to 334j of Puerto Rico's Title 24 and the supporting regulations (the "CNC Act").

Under this regime, a party seeking to open or relocate a pharmacy must first obtain a Certificate of Necessity and Convenience ("CNC") from the Secretary of Health. 24 P.R. Laws Ann. §§ 334 & 334a (1999). The law empowers the Secretary to develop criteria for the issuing of a CNC. The factors to be considered include any "long-term service development plan" of the party seeking the CNC; the current and projected needs of the population to be served by the pharmacy; the percent of the population of the area which would be served by the pharmacy; the current status of the "health system operating in the area"; and the possible existence of alternatives. *Id.* § 334b.

The Secretary is also responsible for establishing a procedure for evaluating

---

1. 42 U.S.C.A § 1983 (2003).

2. The original Defendant was Rullan's predecessor at the Department of Health. Once Rullan took office, he substituted his predecessor as a defendant in this action. See Fed.R.Civ.P. 25(d)(1).

CNC applications. *Id.* § 334f–2. Under this procedure, a party must first submit a letter to the Department of Health stating that it has an interest in seeking a CNC. The party must then file its application. Once the application is submitted, the Department of Health publishes notices of the application in area newspapers and sends letters to pharmacies in the affected area of the application. The existing pharmacies then submit any objections they may have to the proposed action. Afterwards, the Department of Health holds an administrative hearing, at which both the applicant and any objecting pharmacies may submit evidence and expert testimony on, among other things, whether the existing pharmacies are already adequately serving the affected area. After the administrative decision is issued, any disgruntled party may move for reconsideration and seek judicial review to Puerto Rico's Circuit Court of Appeals and Supreme Court.

The Court held Oral Arguments on June 9, 2003 on this matter. During Oral Arguments, the parties agreed to waive the bench trial for this case and requested that the Court issue a ruling based on the parties' respective motions for summary judgment. These motions properly brief the Court on their respective issues. The Court consented to the parties' request, and the Court is now ready to rule.

## I PROCEDURAL HISTORY

This civil action was filed on February 24, 2000. On April 17, 2000, the Secretary filed a Motion to Dismiss duly opposed by Walgreens.[3] On September 28, 2001, this Court issued an Opinion and Order[4] dismissing Walgreens' claim that the CNC law and regulations violate, on their face,

the dormant Commerce Clause. Upon dismissing this claim, the Court noted that Walgreens' remaining claims challenged the application of the CNC Act and its regulations on substantive due process and Commerce Clause grounds. On October 18, 2001, Walgreens moved for reconsideration of the Court's Opinion and Order and filed an Amended Complaint where it allegedly supplements the averments made in its original complaint and clarifies the basis of its facial challenge to the CNC Act.[5]

Subsequent to the Court's opinion, on February 5, 2002, the Puerto Rico Supreme Court issued its decision in *Asociacion de Farmacias de la Comunidad v. Departamento de Salud*, where it invalidated Regulation 89 and reinstated Regulation 56 as the basis for processing CNC petitions by the Secretary of Health. *See Id.*, 2002 TSPR 13, 2002 WL 206999 (Feb. 5, 2002); *Asociacion de Farmacias de la Comunidad v. Departamento de Salud*, 2002 TSPR 69, 2002 WL 1159514 (May 23, 2002). The Supreme Court found that Regulation 89 did not provide specific standards to guide the Secretary's discretion and therefore, the regulation constituted an invalid delegation of legislative authority. In response, the Court revived Regulation 56 prospectively for new CNC applications. According to the Secretary, he is currently in the process of enacting a new Regulation to replace Regulation 89.[6]

On March 27, 2002, the Court ordered Plaintiffs to further amend the complaint in the wake of the Puerto Rico Supreme Court's decision in *Asociacion de Farmacias de la Comunidad*, and denied Plaintiffs' October 18, 2001 motion to reconsider as moot.[7] Notwithstanding, Walgreens

---

3. See Dkts. 5 and 8.

4. See Dkt. 57.

5. See Dkts. 58, 59 and 138 at 2.

6. See Dkts. 122 at 3.

7. See Dkt. 68.

understood its that its Amended Complaint effectively reinstated its facial Commerce Clause challenge to the CNC Act.[8] Moreover, on October 21, 2002, the Secretary filed a motion to dismiss after Walgreens' Amended Complaint.[9] It appears that the Court's order mooting Plaintiffs' motion for reconsideration has confused the parties as to the status of Walgreens' facial challenge to the CNC Act. Walgreens asserts that if its understanding is incorrect, then it reasserts its arguments set forth in its motion for reconsideration. In light of the present confusion, and given that both parties have properly briefed the Court on all claims made in the Second Amended Complaint, the Court will address the facial Commerce Clause claim in resolving this case.

## II FACTS

The following material facts are undisputed by the parties:

1. Plaintiff Walgreens, a corporation duly incorporated under the laws of Illinois with its principal place of business in Illinois, is a leading drugstore retailer in the United States and operates approximately 4000 drugstores in 43 states and in Puerto Rico.[10]

2. Sales of prescription medicines represent approximately half of the sales in Walgreens' drugstores, both nationally and in Puerto Rico.[11]

3. Defendant John V. Rullan is the Secretary of Health of Puerto Rico and is the executive and administrative officer exercising full authority over the Health Department's operations. Pursuant to 20 P.R. Laws Ann. § 383, the Secretary's duties include the enforcement of all laws which relate to the establishment and supervision of pharmacies in Puerto Rico, 24 P.R. Laws Ann. §§ 334, et seq. (the "CNC Act").

4. Puerto Rico's CNC Act grew out of the U.S. government's efforts to influence the regulation of the health care industries by the states. In the 1970's Congress enacted legislation that required states to adopt certificate of need regulations [12] in order to maintain eligibility for federal financial assistance in the health care area. The purpose of this federal law was to control the spiraling cost of health care.[13] Congress thought that market forces alone would not check "overinvestment" in expensive, specialized health care facilities.[14]

5. In 1975, Puerto Rico adopted the CNC Act, modeled on the federal health care legislation then in force, in order to qualify for federal health care funding. The federal legislation never applied to pharmacies.[15]

6. In 1979, Puerto Rico amended the CNC Act, and added pharmacies to the definition of "health facilities" to which the CNC Act applied.[16]

---

8. See Dkt. 138 at 3.

9. See Dkt. 99.

10. See Dkt. 115, Exhibit 1.

11. See Dkt. 115, Exhibits 1 and 2.

12. What the Puerto Rico CNC Act calls a "certificate of necessity and convenience" is what is commonly called a "certificate of need" or "CON" in other U.S. jurisdictions. See Dkt. 115, Exhibit 4 at 22.

13. See Dkt. 115, Exhibit 3 at 7.

14. See Dkt. 115, Exhibit 3, Sager Report at 2–7. The Secretary's expert witness did not quarrel with Prof. Sager's analysis and agreed that it explained the decision of the Puerto Rico legislature to enact the CNC Act in 1975. See Dkt. 115, Exhibit 4, Ramirez Dep. at 77–80.

15. See Law No. 2 of November 7, 1975, 24 P.R. Laws Ann. §§ 334, et seq; Exhibit 4.

16. See Law No. 189 of July 26, 1979, which amended the CNC Act. 24 P.R. Laws Ann. §§ 334, et seq.

7. A party interested in establishing a new pharmacy or relocating an existing pharmacy in Puerto Rico must petition the Health Department for a Certificate of Necessity and Convenience ("CNC").[17]

8. The CNC Act defines a CNC as "[a] document issued by the Secretary of Health authorizing a person to carry out any of the activities covered by sections 334–334j of this title, certifying that the same is necessary for the population it is to serve and that it will not unduly affect the existing services, thus contributing to the orderly and adequate development of health services in Puerto Rico." The CNC Act provides authority to the Secretary to authorize the establishment, relocation and the operation of "Health Facilities." A pharmacy is a health care facility as that term is currently defined under the CNC Act.[18]

9. In 1986, Congress repealed the 1974 legislation that mandated state implementation of the certificate of need process. Pub.L. No. 99–60, § 701, 100 Stat. 3743, 3799 (1986). However, the CNC Act remains the law in Puerto Rico, and Puerto Rico remains the only jurisdiction in the United States to apply its certificate of need law to pharmacies.[19]

10. In 1986, the Health Department adopted Regulation 56 which established both a process for seeking CNCs and detailed substantive criteria to guide the Secretary's CNC determinations.[20]

11. On October 20, 1997, the Health Department promulgated Regulation 89 to replace Regulation 56. Regulation 89 eliminated many of the detailed substantive criteria for granting CNCs that Regulation 56 had established. Instead, the new regulation articulated general criteria for approval of CNCs that largely tracked the criteria set forth in the CNC Act itself.[21]

12. On February 5, 2002, the Puerto Rico Supreme Court invalidated Regulation 89 and reinstated Regulation 56 as the basis for processing CNC petitions by the Secretary of Health. *See Asociacion de Farmacias de la Comunidad v. Departamento de Salud,* 2002 TSPR 13, 2002 WL 206999 (Feb. 5, 2002); *Asociacion de Farmacias de la Comunidad v. Departamento de Salud,* 2002 TSPR 69, 2002 WL 1159514 (May 23, 2002).

13. An applicant or proponent must first submit a letter to Secretary advising the Health Department of his or her interest in filing a CNC petition to establish or relocate a pharmacy. Within thirty (30) days of such letter, the proponent must file the application for the CNC.[22]

14. After the Department of Health receives the CNC application, it publishes a notice in a widely read newspaper announcing to the public the proponent's CNC application. It also mails a letter to all of the pharmacies within the service area of the proposed pharmacy (or the new proposed pharmacy site) notifying them of the proponent's CNC application. Within fifteen (15) days of being notified, the pharmacies interested in opposing the proponent's application must send a letter to the proponent and to the Department of Health stating their opposition and/or interest in participating in the administrative hearing to be held concerning the proponent's CNC application.[23]

---

17. See 24 P.R. Laws Ann. § 334a.

18. See 24 P.R. Laws Ann § 334(d) and (e).

19. See Dkt. 115, Exhibit 1.

20. See Dkt. 115, Exhibit 6.

21. See Dkt. 115, Exhibit 7.

22. See Dkt. 115, Exhibit 6.

23. See Id.

15. Once this process is completed, the administrative file is transferred to the Hearings Division of the Health Department for scheduling of an administrative hearing. The hearing is often delayed if either the applicant or any opposing pharmacies seek discovery.[24]

16. At the administrative hearing, the proponent, as well as the opposing pharmacies, present expert testimony and other evidence in support of their respective positions. After the close of evidence, each party submits a proposed report and recommendation setting forth findings of fact and conclusions of law for the hearing examiner's consideration. Upon completion, the hearing examiner's findings and conclusions are sent to the parties and to the Secretary for a final decision which is also communicated to the parties.[25]

17. If the proponent or any of the opposing pharmacies is dissatisfied with the Secretary's decision, the dissatisfied party can request reconsideration or seek judicial review of the Secretary's decision by the Puerto Rico Circuit Court of Appeals, and subsequently, the Supreme Court. Appellate review may add an additional year (in some cases several years) to the CNC process.[26]

18. Puerto Rico is the only U.S. jurisdiction to require a CNC to open a new pharmacy.[27]

19. At the time of the amendment of the CNC Act to add pharmacies, Walgreens had twelve (12) pharmacies operating in Puerto Rico and was poised to expand its operations on the Island.[28]

20. Although the CNC Act on its face imposes administrative burdens on every pharmacy seeking to expand its operations in Puerto Rico, the Asociacion Farmacias de Comunidad de Puerto Rico ("Asociacion"), the trade association of local pharmacies in Puerto Rico, has consistently supported the application of the CNC Act to pharmacies. Membership in the Asociacion is limited to "community pharmacies or chains in which majority shareholders are residents of Puerto Rico." *Walgreen Co. v. Feliciano*, 6 Fed.Appx. 27, 2001 WL 355531 (1st Cir.2001).[29]

21. Prescription drug price information is available to consumers. It is the policy of Walgreens' pharmacies to always respond to consumer inquiries concerning prescription drug prices and Walgreens pharmacies frequently receive calls from consumers asking about the prices for particular drugs.[30]

22. Retail pharmacies in Puerto Rico compete with each other with respect to non-price aspects of their operation such as location, hours of operation, range of prescription and non-prescription products, parking facilities, and quality of service.[31]

23. According to the Statement of Purpose that accompanied the CNC Act, the Act has three objectives: (1) to satisfy the health needs of the population; (2) to reduce medical and hospital costs; and (3) to assure the availability of health services in unattended regions.[32]

24. See Dkt. 115, Exhibits 6 and 8.

25. See Id; Exhibit 9.

26. See Id.

27. See Dkt. 115, Exhibits 1 and 4.

28. See Dkt. 115, Exhibit 1.

29. See also Dkts. 115, Exhibit 1.

30. See Dkt. 115, Exhibit 1.

31. See Dkt. 115, Exhibits 1, 3, and 14(b).

32. See, Law No. 2 of November 7, 1975, "Leyes y Resoluciones de Puerto Rico", Part 2, Vol.1975 at 1010–1013; see also Dkt. 115, Exhibit 15.

## III DISCUSSION

### A. Application of the CNC Act to Retail Pharmacies—Due Process Claim

Walgreens first contention is that the application of the CNC Act to retail pharmacies does not advance any legitimate public purpose. Any consideration of the CNC Act's constitutionality must start with establishing the appropriate level of judicial scrutiny. *Montalvo–Huertas v. Rivera–Cruz*, 885 F.2d 971, 976 (1st Cir. 1989).

The Supreme Court has developed a tripartite rubric for evaluating challenges to legislation under the Equal Protection and Due Process clauses. *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42 (1st Cir.2003). When a statute burdens certain "fundamental rights" (*e.g.*, voting rights or the right to interstate travel) or distinguishes between people on the basis of certain "suspect characteristics" (*e.g.*, race or national origin), the statute is subject to "strict scrutiny." *Zablocki v. Redhail*, 434 U.S. 374, 388, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *see also Atty. Gen. of N.Y. v. Soto–Lopez*, 476 U.S. 898, 906, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986) (right to interstate travel); *Shaw v. Reno*, 509 U.S. 630, 643–45, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (racial classifications). To survive strict scrutiny, the statute must serve a compelling state purpose and be narrowly tailored to achieving that purpose. *Zablocki*, 434 U.S. at 388, 98 S.Ct. 673. The Supreme Court has identified other classifications, such as illegitimacy, which are less "suspect" and thus subject to a less exacting level of scrutiny, often characterized as "intermediate" scrutiny. In such cases, the government must demonstrate that the challenged classification is "substantially related to an important government objective." *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988).

All other regulations, including the statute under review in this case, are subject to the third and least exacting tier of scrutiny, "rational basis" review, requiring only that the regulation bear some rational relation to a legitimate state interest. *Romer v. Evans*, 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). "Social and economic legislation ... that does not employ suspect classifications or impinge on fundamental rights must be upheld ... when the legislative means are rationally related to a legitimate government purpose." *Hodel v. Indiana*, 452 U.S. 314, 331, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981).

The Court starts with the presumption of the constitutional validity of a state law.[33] *See Missouri v. Jenkins*, 515 U.S. 70, 112, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (O'Connor, J., concurring); *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Under the standard of review applicable to this case, that Court's role demands deference and restraint. *See FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313–14, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) ("This standard of review is a paradigm of judicial restraint."). "Even foolish and misdirected provisions" will be upheld under this test. *Kittery Motorcycle*, 320 F.3d at 47 (citing *Craigmiles v. Giles*, 312 F.3d 220, 223–24 (6th Cir.2002)). In order to defeat Walgreens' claim, the Secretary need only articulate some "reasonably conceivable set of facts" that could establish a rational relationship between the challenged laws

---

**33.** Puerto Rico is treated as a state for purposes of the Due Process Clause of the Fourteenth Amendment. *Mundo–Rios v. Vizcarrondo–Irizarry*, 228 F.Supp.2d 18, 28 (D.P.R. 2002) (citing *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 668–69 n. 5, 94 S.Ct. 2080, 40 L.Ed.2d 452(1974)).

and the government's legitimate ends. *Kittery Motorcycle,* 320 F.3d at 47 (citing *Montalvo–Huertas,* 885 F.2d at 978). These proffered facts "need not be supported by an exquisite evidentiary record," *Craigmiles,* 312 F.3d at 224, nor by any evidentiary record at all. *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) ("A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification."); *Beach Communications,* 508 U.S. at 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 ("[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.").

### 1. Application of Rational Basis Test

■ According to the Statement of Purpose that accompanied the CNC Act, the Act has three objectives: (1) to satisfy the health needs of the population; (2) to reduce medical and hospital costs; and (3) to assure the availability of health services in unattended regions.[34] In his Motion for Summary Judgment, the Secretary does not address whether the second objective applies to the CNC Act's regulation of pharmacies. The Secretary only addresses the first and third objectives of the Act. Specifically, he states, "the CNC Act seeks to regulate the licensing of prescription pharmacies ... so that they are geographically distributed to satisfy the health needs of the population and are not concentrated in a given geographic area."[35]

The Court will therefore analyze whether application of the CNC Act to pharmacies is rationally related to the government's purpose of encouraging the establishment of pharmacies in unattended areas of Puerto Rico.

Walgreens argues that there is no rational support for the CNC regulatory scheme in which pharmacies established in an area where a proponent seeks to operate are provided an opportunity to comment and oppose the proponent's request. According to Walgreens, if a pharmacy is denied a CNC to establish in an area where the applicant perceives a desirable business opportunity, the applicant will not, as a consequence of the denial, opt to establish in an area where there is no such opportunity. Walgreens further argues that the CNC does nothing to create business opportunities in "underserved" areas such as by providing tax incentives or subsidies for pharmacies that are willing to establish in the poorest neighborhoods or in rural areas where demand is low.

Plaintiffs contend that the tenuous relation between the CNC Act and the goal of promoting pharmacies in "underserved" communities is further apparent given the undisputed evidence that (1) there are at least as many pharmacies per capita in Puerto Rico as there are on the mainland,[36] (ii) Puerto Ricans are highly mobile, as reflected in the number of automobiles per household,[37] and (iii) consumers in Puerto Rico can obtain prescription drugs by mail order and via internet, as well as from more than 900 private pharmacies on the island.[38]

---

**34.** See, Law No. 2 of November 7, 1975, "Leyes y Resoluciones de Puerto Rico", Part 2, Vol.1975 at 1010. This statement of purpose was part of the 1975 Puerto Rico statute that created the CNC scheme. As enacted in 1975, the Act did not apply to retail pharmacies. Retail pharmacies were added in 1979 by an amendment that had no statement of purpose and as to which there appears to be no legislative history. See Dkt. 115 at 14.

**35.** See Dkt. 122 at 6.

**36.** See Dkt. 115, Exhibit 3, Sager Report at 9 and Exhibit 5, Freyre Report at 11–13.

**37.** See Dkt. 115, Exhibit 5, Freyre Report at 12.

**38.** See Dkt. 15, Exhibit 5, Freyre Report at 12–13.

Although Walgreens has presented a solid case demonstrating the statute's inefficiency, imperfections and overall questionable wisdom, Walgreens faces an uphill battle. Walgreens argues that the Secretary has failed to support his contention that the CNC Act in any way helps promote the goal of encouraging the establishment of pharmacies in "underserved" areas. However, the Secretary only needs to articulate some "reasonably conceivable set of facts" that establish a rational relationship between the law and the proffered objective. *Kittery Motorcycle,* 320 F.3d at 47. Moreover, these facts "need not be supported by any evidentiary record at all." *Id.* (citing *Heller,* 509 U.S. at 320, 113 S.Ct. 2637). In fact, the Supreme Court has stated, "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Communications,* 508 U.S. at 313–14, 113 S.Ct. 2096.

The record shows that Walgreens has not been denied access to areas where there are no established pharmacies. In fact, one hundred percent (100%) of Walgreens' unopposed CNC applications have been granted by the Department of Health. Only pharmacies located in a one-mile radius from the proposed pharmacy can oppose the application. Hence, the Secretary treats areas lacking a pharmacy within a one-mile radius as "underserved." Given this scenario, it is reasonable for the Commonwealth to conclude that a pharmacy may opt to establish in an "underserved" location. If virtually all CNC petitions are granted if unopposed, then a potential pharmacy has a strong incentive in seeking an "underserved" location. Plus, the pharmacy will save a significant amount of time and money in the application process.

 Still, Walgreens questions whether any "underserved" communities

even exist today in Puerto Rico, and the Secretary's own expert fails to illustrate whether the geographic distribution of pharmacies in Puerto Rico is inequitable. Nevertheless, the Court must be cautious with this line of analysis. As the First Circuit has stated, "evaluating the continued need for, and suitability of, legislation ... is exactly the kind of policy judgment that the rational basis was designed to preclude." *Montalvo–Huertas,* 885 F.2d at 977 (citing *Ferguson v. Skrupa,* 372 U.S. 726, 731, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1963)). Moreover, "by suggesting that a statute must be rationally related to the purpose which actually motivated its enactment, [plaintiffs] are in effect applying a heightened level of scrutiny." *Id.* at 978.

 The CNC law, like other social or economic legislation, carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality. Plaintiffs must remember that the constitutional inquiry does not look to the CNC law's wisdom or questions whether the law has in fact achieved its goal. *Id.* In essence, "[a] court may only ask whether Puerto Rico's legislature 'rationally could have believed that [the CNC Act] would promote its objective.'" *Id.* (citing *Western & Southern Life Ins. Co. v. Board of Equalization,* 451 U.S. 648, 671–72, 101 S.Ct. 2070, 2084–85, 68 L.Ed.2d 514 (1981)). The Court finds that the Secretary has established a rational relationship between the application of the CNC Act to pharmacies and the goal of encouraging the establishment of pharmacies in "underserved" areas. While it may be true, as Walgreens argues, that a more tailored law would better serve both the public and pharmacy owners, it is not this Court's duty to pass judgment on the law's utility. If the Puerto Rico legislature has used its power unwisely, this is

a matter for the voters, not the federal courts. *Montalvo–Huertas,* 885 F.2d at 982. Under rational basis review, this Court is constrained to conclude that the application of the CNC Act to pharmacies does not run afoul of the Constitution's Due Process Clause.

## B. Dormant Commerce Clause Challenge

Walgreens maintains that the CNC Act violates the dormant Commerce Clause on three grounds. First, it claims that the CNC Act facially discriminates against interstate commerce by erecting significant procedural and substantive barriers to entry into the retail pharmacy business for the express purpose of protecting existing pharmacies from competition. Second, Walgreens argues that the practical effect of the application of the CNC Act to pharmacies has been discrimination against national pharmacy chains.[39] Third, they assert that even if the application of the CNC Act did not discriminate against national pharmacy chains, the Act's erection of entry barriers imposes burdens on interstate commerce that are not outweighed by local benefits, and therefore violates the dormant Commerce Clause.

 The Commerce Clause states: "The Congress shall have Power ... To regulate Commerce ... among the several States...." U.S. CONST. ART. I, § 8 CL. 3. This affirmative grant of authority to Congress also encompasses an implicit "dormant" limitation on the authority of the states to enact legislation affecting interstate commerce.[40] *See Healy v. Beer Inst.,* 491 U.S. 324, 326, 109 S.Ct. 2491, 105

L.Ed.2d 275 (1989). At the same time, the Supreme Court has long recognized that "in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *So. Pac. Co. v. Arizona, ex rel. Sullivan,* 325 U.S. 761, 767, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). While this "residuum" is particularly strong when a state acts in the interest of health and consumer protection, a finding that it has acted to further these matters of legitimate concern does not automatically end the inquiry. *Philip Morris, Inc. v. Reilly,* 2001 WL 1215365 *13 (1st Cir.2001) (citing *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 350, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). Overall, the core purpose of the dormant Commerce Clause is to prevent states and their political subdivisions from promulgating protectionist policies. *Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 185 (1st Cir.1999) (citing *Camps Newfound/Owatonna v. Town of Harrison,* 520 U.S. 564, 578, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997)).

 The First Circuit has noted that the prohibitions imposed upon state regulations by the dormant Commerce Clause fall into three general categories. *Philip Morris,* 2001 WL 1142018 *13; *Pharm. Research and Mfrs. of Am. v. Concannon,* 249 F.3d 66, 79 (1st Cir.2001). To determine whether a statute violates the dormant Commerce Clause, courts apply dif-

---

**39.** Throughout this opinion the Court will refer to non-local pharmacy chains (*i.e.,* chains originating outside of Puerto Rico) as national pharmacy chains, mainland pharmacies or out-of-state interests. The national pharmacy chains in Puerto Rico include Walgreens, K–Mart and Wal–Mart.

**40.** Puerto Rico is treated as a state for purposes of the Dormant Commerce Clause. *Used Tire Int'l, Inc. v. Diaz–Saldana,* 155 F.3d 1, 4 n. 2 (1st Cir.1998); *Trailer Marine Transp. Corp. v. Rivera Vazquez,* 977 F.2d 1, 7 (1st Cir.1992); *Nat'l Pharmacies, Inc. v. De Melecio,* 51 F.Supp.2d 45, 56 n. 21 (D.P.R. 1999), *aff'd,* 221 F.3d 235 (1st Cir.2000).

ferent levels of analysis, depending on the effect and reach of the legislation. *Concannon*, 249 F.3d at 79.

■■■■ First, a state statute is a per se violation of the Commerce Clause when it has an "extraterritorial reach." *Philip Morris*, 2001 WL 1215365 *13; *Concannon*, 249 F.3d at 79 (citing *Healy*, 491 U.S. at 336, 109 S.Ct. 2491). Hence, a state statute is invalid when it regulates commerce occurring wholly outside the state's borders or when it has a practical effect of requiring out-of-state conduct to be carried on according to in-state terms. *Id.* A statute will have an extraterritorial reach if it necessarily requires out-of-state commerce to be conducted according to in-state terms. *Concannon*, 249 F.3d at 79.

■■■■ Second, if a state statute discriminates against interstate commerce, the court applies strict scrutiny. If the statute discriminates against out-of-state commerce, or its effect is to favor in-state economic interests over out-of-state interests, it will be invalid unless the state can "show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Philip Morris*, 2001 WL 1215365 *13 (citing *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 100–01, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994) (alteration and internal quotation marks omitted)); *see also Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (indicating that a finding of discriminatory purpose or discriminatory effect can constitute economic protectionism subjecting the state statute to a "stricter level of invalidity").

■■■■ Lastly, the Court applies a lower level of scrutiny if the state statute does not discriminate but has incidental effects on interstate commerce. *Philip Morris*, 2001 WL 1215365 *13; *Concannon*, 249 F.3d at 80. In this situation, the *Pike* balancing test is applied. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Under this test, "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.*

Walgreens' claims fall into the second and third categories of prohibitions imposed upon state regulations by the dormant Commerce Clause.[41] Walgreens maintains that the CNC Act discriminates against interstate commerce on its face and in practical effect, and therefore, is per se violative of the dormant Commerce Clause. Walgreens argues that the Act erects significant procedural and substantive barriers to entry into the retail pharmacy business for the express purpose of protecting existing pharmacies from competition. It further contends that the practical effect of the application of the CNC Act to retail pharmacies has been discrimination against national pharmacy chains. Walgreens next argues that even if the application of the CNC Act did not discriminate against national pharmacy chains, the Act's erection of entry barriers imposes burdens on interstate commerce that are not outweighed by local benefits, and therefore fails the *Pike* balancing test.

### 1. Strict Level of Scrutiny: Discriminatory Statute

### a) Facial Discrimination Challenge

■■■■ The Court will first address the question of whether the challenged statute

---

**41.** Walgreens does not argue that the CNC Act is per se invalid because it regulates conduct beyond Puerto Rico.

discriminates on its face against interstate commerce (as opposed to regulating commerce evenhandedly with only incidental effects on interstate commerce). *Houlton,* 175 F.3d at 185; *C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). A statute that discriminates on its face against interstate commerce and in favor of local businesses is per se invalid, unless the state can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest. *C & A Carbone,* 511 U.S. at 392, 114 S.Ct. 1677.

Walgreens argues that the CNC Act facially violates the dormant Commerce Clause because it (i) created significant regulatory barriers to entry into the retail pharmacy market in Puerto Rico but relieved the large, and almost entirely local, group of existing pharmacies from the obligation to meet the same standards as would-be market entrants, and (ii) precludes the grant of a CNC without an administrative certification that existing pharmacies will not be "unduly affect[ed]" by the proposed competition. Walgreens asserts that in no other U.S. jurisdiction are there significant regulatory barriers to entering the retail pharmacy market.[42] In Puerto Rico it is not enough that a business obtain space, purchase equipment and inventory, hire licensed personnel and obtain a pharmacy license, a business must also obtain a CNC. Walgreens argues that this expensive and time-consuming process is a significant barrier to entry.

Although Walgreens complains of the inefficient, time-consuming, and complicated procedure that it must go through to receive the permit, any local economic interest seeking to obtain a CNC must also jump through the same bureaucratic hoops. Still, Walgreens maintains that the Act is no less discriminatory because Puerto Rico businesses that seek to establish a competing pharmacy face the same obstacles. Walgreens cites the seminal case *C & A Carbone, Inc. v. Clarkstown,* 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), in support of its argument. In *C & A Carbone,* the Court held that a town's ordinance requiring that all waste generated in the town be processed by a particular recycling facility discriminated against interstate commerce. The Court held, "With respect to this stream of commerce, the ordinance discriminates, for it allows only the favored operator to process waste that is within the town's limits. It is no less discriminatory because in-state or in-town processors are also covered by the prohibition." *Id.* at 384, 114 S.Ct. 1677. Before reaching this conclusion, the Court first found that the flow control ordinance regulated interstate commerce because it drove up the cost for out-of-state interests to dispose of their solid waste. Moreover, the ordinance excluded everyone except one local operator from processing the waste.

The case presently before this Court is clearly distinguishable from *C & A Carbone.* In contrast to the flow control ordinance of Clarkstown, the CNC Act does not deprive out-of-state businesses of access to the local market. It does not prohibit local or national pharmacy chains from establishing in Puerto Rico, nor are its economic effects interstate in reach. Although the Act requires pharmacies to jump through several bureaucratic hoops in order to receive a permit, and this process may pose obstacles to entry in certain service areas, the Act does not preclude the establishment of competing pharmacies.

The First Circuit case *National Revenue Corp. v. Violet,* 807 F.2d 285 (1st Cir.1986), which Walgreens cites in con-

---

**42.** See Dkt. 115, Exhibit 1, Tovian St. ¶ 15.

nection with its facial discrimination claim is similarly inapposite. The First Circuit in *National Revenue* declared a Rhode Island statute invalid on Commerce Clause grounds where it defined debt collecting as a practice of law and prohibited nonlawyers from engaging in debt collection. The Court held the statute effectively barred out-of-staters from offering a commercial service while bestowing economic benefit upon a class largely composed of Rhode Island citizens. In contrast to the CNC Act, the Rhode Island statute effectively foreclosed out-of-state debt collectors, en masse, from seeking to collect debts from Rhode Island citizens. The CNC Act does not foreclose national pharmacy chains from establishing in Puerto Rico.

The First Circuit has clearly stated that "to the extent that in-state and out-of-state bidders are allowed to compete freely on a level playing field, there is no cause for constitutional concern." *Houlton*, 175 F.3d at 188. While addressing whether a challenged ordinance discriminated on its face against interstate commerce, the First Circuit in *Houlton* held that if local legislation leaves all comers with equal access to the local market, it does not offend the dormant Commerce Clause. In the present case, the CNC Act does not exclude mainland pharmacy chains from applying for a permit. On the contrary, all interests—be they based inside or outside of Puerto Rico—must submit to the same onerous procedures. The record contains no hint that the statute is shaped to favor local pharmacies, nor does the Act include terms that either give local pharmacies a leg up or disadvantage their out-of-state rivals. Both in-state and out-of-state applicants may apply freely to obtain a CNC, and national pharmacy chains are not reviewed any differently than local pharmacies. Accordingly, the Court finds that the

CNC Act does not facially discriminate against interstate commerce.

**b) Discriminatory Purpose**

 Walgreens next attempts to invoke the proposition that the CNC Act is invalid because it was designed with a discriminatory purpose. When it is shown that a law was enacted with a purpose to discriminate against interstate commerce, a strict scrutiny analysis is also required. *Environmental Waste Reductions, Inc. v. Reheis*, 887 F.Supp. 1534, 1558 (N.D.Ga. 1994); *see also Chemical Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 344, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992) (explaining that a finding of impermissible economic protectionism may be made on the basis of a discerned discriminatory purpose).

 Walgreens contends that the statute's protectionist intent is evident because the statute precludes the grant of a CNC without an administrative certification that existing pharmacies will not be unduly affected by the proposed competition. Moreover, the Act relieves an overwhelmingly local group of existing pharmacies of the obligation of meeting the same standards as newcomers. The CNC Act defines a CNC as "[a] document issued by the Secretary of Health authorizing a person to carry out any of the activities covered by sections 334–334j of this title, certifying that the same is necessary for the population it is to serve and that it will not unduly affect the existing services, thus contributing to the orderly and adequate development of health services in Puerto Rico." 24 P.R. Laws Ann. § 334(e). When the CNC Act was amended in 1979 to include pharmacies, those pharmacies already in existence—a group that is almost entirely composed of local pharmacies[43]— were "grandfathered," *i.e.*, automatically

---

**43.** See Dkt. 115, Exhibit 5, Freyre Report at 2.

entitled to a CNC. 24 P.R. Laws Ann. § 334g.

The fact that an overwhelming majority of the pharmacies in the island prior to 1979 were locally-owned, and this group was relieved from having to undergo the CNC application process, does not lead the Court to adduce a protectionist intent from the statute. In fact, at the time of the CNC amendment, Walgreens had twelve (12) pharmacies operating in Puerto Rico.[44] Hence, this group of Walgreens stores were also "grandfathered"—as coined by Plaintiffs—and automatically entitled to a CNC. When the CNC Act was amended to include pharmacies, the statute made no distinction between local and national pharmacies. On the contrary, the only distinction the statute makes among pharmacies are those established prior to and after October 24, 1979. In sum, Walgreens has not presented sufficient evidence to substantiate its conclusory allegation of discriminatory purpose.

c) Discriminatory Effect

 Walgreens next avers that the practical effect of the CNC Act on retail pharmacies has been discrimination against mainland pharmacy chains. When a statute's effect is to favor in-state economic interests over out-of-state interests, courts have generally struck down the statute without further inquiry. *Concannon*, 249 F.3d at 80 (citing *Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986)). Walgreens argues that the CNC Act does not constrain the expansion of local pharmacies yet creates a significant barrier to entry for mainland retail chains. As demonstrated in Table 4

of Dr. Freyre's Report, all unopposed petitions—either from local or out-of-state pharmacies—were granted by the Secretary. The numerical differential relates to opposed petitions. According to data provided by the Department of Health, the Secretary has granted ninety percent (90%) of local pharmacy petitions when opposed, and fifty-eight percent (58%) of mainland petitions when opposed. Moreover, even when the CNC is granted, it takes considerably longer for mainland pharmacy chains to obtain their CNCs than it takes for local pharmacies.[45] Walgreens claims that such delays increase the cost of opening a pharmacy and constitute another discriminatory barrier to entry.

Although local pharmacies are granted a CNC at a much higher rate than their out-of-state counterparts, this bare fact is insufficient to establish a pattern of discrimination against non-local pharmacy chains. Plaintiffs provide no information regarding the reasons for the denials of the out-of-state petitions vis a vis the local petitions. For example, certain petitions may have been denied because they were defective, or they sought the establishment of a pharmacy in a service area considered highly saturated pursuant to CNC guidelines. The Court is also unaware of the reasons why the CNC petitions granted to national pharmacies undergo a longer application process than those of local pharmacies. A myriad of factors might affect the application time-line. Such factors may include the service area where the pharmacy seeks to operate, the number of pharmacies already in the area, and the

---

**44.** See Docket 115, Exhibit 1, Tovian St. ¶ 4. According to the 1977 Census of Business, a total of 859 single unit drug stores comprised 91.2% of the total number of establishments (942). See Exhibit 5, Freyre Report at 2.

**45.** On average, it takes Walgreens eight (8) months longer than the local chains El Amal/Moscoso to obtain a CNC on opposed petitions. See Dkt. 115, Exhibit 5, Freyre Report, Table 6.

ratio of the area's population per pharmacy.

Walgreens does not present sufficient evidence from which the Court can derive a pattern of discrimination that amounts to a constitutional violation. For example, Walgreens presents a Table listing the months it takes for the Department of Health to notify a decision to mainland pharmacies versus local pharmacies per municipality.[46] Although the Table lists the time-line, it provides no information regarding the dates of these applications, the service area covered by the application, or its level of saturation. This limited information is not sufficient for the Court to draw a fair comparison. Absent clearer data, the Court is unable to attribute any probative value to such numbers. In sum, the evidence presented by Walgreens is insufficient to prove that the CNC Act's effect is to favor in-state over out-of-state interests. Accordingly, the Court finds that the CNC Act's application to pharmacies does not discriminate against interstate commerce.

### 2. Low Level of Scrutiny: Pike Balancing Test

Walgreens' final contention is that even if the application of the CNC Act did not discriminate against national pharmacy chains, the Act's erection of entry barriers imposes burdens on interstate commerce that are not outweighed by its local benefits, thus violating the dormant Commerce Clause as applied in *Pike*. This contention, which calls for the application of the *Pike* balancing test, *see Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), "stands on uncertain legal terrain." *Grant's Dairy v. Comm'r of Maine Dep't of Agriculture*, 232 F.3d 8, 24 (1st Cir.2000).

When a state statute regulates evenhandedly and has only incidental effects on interstate commerce, the statute will be upheld unless the burden on interstate commerce is "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142, 90 S.Ct. 844. Under *Pike*:

> If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* Here, the CNC Act regulates evenhandedly and its effects on interstate commerce are only incidental. Thus, the question is one of degree: whether the burden it imposes compared to the putative local benefits is clearly excessive.

According to Walgreens, the CNC Act erects significant procedural and substantive barriers to entry into the retail pharmacy business, thereby burdening interstate commerce. Pursuant to this theory, the statute's incidental effect on interstate commerce is that it limits the market entry of out-of-state pharmacies in certain locations on the island. The statute limits competition, and thus, the establishment of out-of-state pharmacy chains in Puerto Rico.

Walgreens cites to the Fourth Circuit case *Medigen of Kentucky, Inc. v. Public Service Comm.*, 985 F.2d 164 (1993) to support the argument that the CNC requirement is invalid under the *Pike* test. In *Medigen* an interstate transporter of infectious medical waste challenged a West Virginia requirement that such transporters obtain a certificate of convenience and necessity to operate within the state. The Court held that the burden imposed by the

---

**46.** See Dkt. 115, Exhibit 5, Freyre Report, Table 6.

certification requirement on interstate commerce outweighed its local benefits. Although *Medigen* is analogous to the present case in that is involves a CNC law, the cases differ in their connection to interstate commerce. The Fourth Circuit in *Medigen* found that the CNC law burdened interstate commerce because it restricted the market entry of haulers of medical waste. Since the Plaintiffs in *Medigen* were *interstate* transporters of infectious waste, the potential burden to interstate commerce is more direct than in the present case. In fact, the district court in *Medigen* had found that the certification requirement was a "direct" regulation of interstate commerce. In contrast to the plaintiffs in *Medigen*, Walgreens is unable to make a clear showing of the CNC Act's burden on interstate commerce.

▆▆▆ The problem with Walgreens' proffered burden is that "the [Commerce] Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." See *Philip Morris*, 267 F.3d at *16; *Concannon*, 249 F.3d at 84 (citing *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127–128, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978)). Two recent First Circuit cases, *Phillip Morris* and *Concannon*, have both noted that when the only burden imposed on interstate commerce is an Act's possible effects on the profits of individual manufacturers, this is not sufficient to rise to a Commerce Clause burden. "The fact that a law may have 'devastating economic consequences' on a particular interstate firm is not sufficient to rise to a Commerce Clause burden." *Concannon*, 249 F.3d at 84 (citing *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 827 (3rd Cir. 1994)). The Second Circuit has also stated that an excessive burden in relation to

putative benefits is a burden on interstate commerce that is different from the burden imposed on intrastate commerce. *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 217 (2d Cir.2003); *see also Gary Peake Excavating Inc. v. Town Bd. of Town of Hancock*, 93 F.3d 68 (2d Cir.1996) ("We have explained that the 'incidental burdens' to which *Pike* refers are the burdens on interstate commerce that exceed the burdens on intrastate commerce.").

Although the CNC Act may prevent Walgreens and other out-of-state pharmacy chains from establishing a pharmacy in a particular area of Puerto Rico, the Act does not prevent out-of-state interests from operating in the island. To the contrary, there are currently around fifty (50) Walgreens pharmacies on the island.[47] Out of fifty-eight (58) CNC petitions filed by Walgreens, forty-three (43) of these have been granted.[48] Walgreens has not been denied access to the Puerto Rico market, except insofar as it seeks to establish new pharmacies in a one-mile radius where there are other existing pharmacies. More importantly, the statute applies equally to all potential pharmacies, regardless of their point of origin. Local pharmacy chains must face the same onerous procedure to obtain a CNC. The Act imposes the same burden on local pharmacy chains that seek to operate on the island. Therefore, the statute does not impose burdens on interstate commerce that exceed the burdens imposed on intrastate commerce.

▆▆▆ The Court next considers the benefits the Commonwealth seeks to secure by imposing the CNC Act. Puerto Rico has a legitimate interest in regulating its pharmacies subject to constitutional

---

47. See Dkt. 122, Secretary's Statement of Material Facts, ¶ 7.

48. See Dkt. 115, Exhibit 5, Freyre Report, Table 3.

constraints. A state has a legitimate interest in promulgating regulations governing the health and safety of its citizens. *Maine v. Taylor*, 477 U.S. 131, 151, 106 S.Ct. 2440, 2454, 91 L.Ed.2d 110 (1986); *Houlton*, 175 F.3d at 191. Even though a statute may cause the consuming public to be injured by the loss of the high-volume, low-priced businesses, if it does not burden interstate commerce, the problem will be one as to the wisdom of the legislation, not its constitutionality. *Exxon Corp.*, 437 U.S. at 127–28, 98 S.Ct. 2207. While it may be true, as Walgreens argues, that the procedures put in place by the CNC Act are inefficient, unnecessarily bureaucratic, and overly-time consuming, it is not the duty of this Court to undergo a utility analysis. Given the Act's modest burden on *interstate* commerce, the Court is unable to conclude that this burden is "clearly excessive" in relation to its *putative* local benefits. Hence, the CNC Act is not invalid under the *Pike* test.

## IV CONCLUSION

In upholding the application of the CNC Act to retail pharmacies, 24 P.R. Laws Ann. § 334 *et seq*, and supporting regulation, the Court does no more than recognize that, "under the system of government created by our Constitution, it is up to the legislatures, not courts to decide on the wisdom and utility of legislation." *Montalvo–Huertas*, 885 F.2d at 982 (citing *Ferguson*, 372 U.S. at 729, 83 S.Ct. 1028). Under the rationality review accorded to this statute, the Court concludes that application of the CNC Act to pharmacies does not violate the Due Process Clause. The Court further concludes that the CNC Act does not violate the dormant Commerce Clause. Accordingly, the Court hereby **DENIES** Walgreens' Motion for Summary Judgment (Dkts. 115) and

**GRANTS** the Secretary's Motion for Summary Judgment (Dkts. 122).

**IT IS SO ORDERED.**